JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

James Brady

## DEFENDANTS

Minuteman Security Technologies Inc. d/b/a Minuteman Security & Life Safety

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Malamut & Associates, LLC, 457 Haddonfield Rd #500, Cherry Hill, NJ 08002 (856) 424-1808

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
American with Disabilities Act

Brief description of cause:
Employment discrimination and retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
November 20, 2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Mark R. Natale

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

10/2024

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

---

*RELATED CASE IF ANY:*  Case Number:_____    Judge:_____

1. Does this case involve property included in an earlier numbered suit?    Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?    Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?    Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?    Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?
If yes, attach an explanation.    Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ is / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.*  *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☒ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
- ☐ 16. All Other Federal Question Cases. *(Please specify):*_____

*B.*  *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):*_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases:  *(Please specify)*_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ does / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| James Brady, | |
| *Plaintiff,* | **Civil Action No.:** |
| v. | |
| Minuteman Security Technologies Inc. d/b/a Minuteman Security & Life Safety, | |
| *Defendant.* | **JURY TRIAL DEMANDED** |

**COMPLAINT**

1.      This is an action for an award of damages, declaratory and injunctive relief, attorneys' fees, and other relief on behalf of Plaintiff, James ("Jim") Brady. Plaintiff was an employee of Defendant Minuteman Security Technologies Inc. d/b/a Minuteman Security & Life Safety (hereinafter "Minuteman Security") and has been harmed by the Defendants' as a result of being discriminated and retaliated against, and wrongfully terminated by his employer solely due to his age.

2.      This action arises under the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), as amended, 43 P.S. § 951, *et seq.*

**PARTIES**

3.      Plaintiff, James ("Jim") Brady, is a former employee of the Defendant.

4.      Defendant Minuteman Security Technologies Inc. d/b/a Minuteman Security & Life Safety is Plaintiff's former employer. At all times relevant hereto, Defendant was acting through their agents, servants, and employees, who were acting within the scope of their authority,

1

course of their employment, and under the direct control of Defendant. At all times material herein, Defendant is a "person" and "employer" as defined under the ADEA, 29 U.S.C. §§ 630(a)–(b).

## JURISDICTION AND VENUE

5.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 as Plaintiff's claims are substantively based on the Age Discrimination in Employment Act of 1967, as amended.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

7.     This Court also has supplemental jurisdiction over Plaintiff's State law claims under the PHRA and common law pursuant to 28 U.S.C. § 1367(a) because the Court has original jurisdiction over Plaintiff's ADEA claims and these claims are so related as to form part of the same case or controversy.

8.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because it is the district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

2

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      On or around September 9, 2025, Plaintiff timely filed a charge of discrimination, retaliation, and wrongful termination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the Age Discrimination in Employment Act of 1967 ("ADEA").

10.     On or about September 11, 2025, the EEOC issued Plaintiff a Notice of Right to Sue within 90 Days. **Exhibit A, EEOC Notice of Right to Sue**.

11.     Plaintiff's PHRA claims are still pending before the PHRC because less than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's Charge.

12.     This action is being commenced within ninety (90) days of Plaintiff receiving the Notice of Right to Sue.

13.     Plaintiff has complied with all administrative prerequisites to bring this lawsuit.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

14.     Plaintiff had been employed with Defendant Minuteman Security, previously known as "Access Security Corporation" ("ASC"), for approximately twenty-one (21) years, beginning his career in or around 2004 until Defendant abruptly terminated his employment on or about August 8, 2025.

15.     At the time Defendant wrongfully terminated Plaintiff's employment, Plaintiff was sixty-one (61) years of age.

16.     Plaintiff spent the majority of his career for ASC, which was acquired by Defendant Minuteman Security on or about July 1, 2024.

17.     ASC was a company still in its infancy when Plaintiff began his employment and he played an instrumental role in expanding ASC's footprint in the security industry.

3

18.    Defendant Minuteman Security commented on ASC's success in a press release concerning the acquisition, stating "ASC has been providing enterprise security technology solutions in Eastern Pennsylvania, New Jersey and Delaware for more than 25 years, and has grown to include more than 20 team members based out of its Warminster, PA headquarters." *See*, **Exhibit B, Minuteman Press Release**. The press release offered further praise of ASC, stating that ASC's President and Founder "Dan Cogan and his team have built an intensely loyal customer base in the greater Philadelphia area, with their longevity and attention to detail." *Id.*

19.    In the approximately twenty (20) years that Plaintiff worked for ASC, Plaintiff had been Mr. Cogan's righthand man, developing key operating procedures that drove ASC's success and market growth.

20.    Upon Defendant's acquisition of ASC on or about July 1, 2025, Defendant retained many of ASC's employees, including Plaintiff and Mr. Cogan, in addition to Defendant merging its own pre-existing employees.

21.    Once Defendant assumed full control of the company's operations, the atmosphere and work environment changed dramatically.

22.    Initially, the former owner, Mr. Cogan, remained in a management position acting as the Branch Manager for Defendant's new Warminster branch.

23.    Shortly thereafter, Mr. Cogan resigned from the company.

24.    Due to Mr. Cogan's departure, Defendant needed to hire a new Branch Manager.

25.    Since Plaintiff had extensive experience in the security industry, specifically at Defendant's company, Plaintiff applied for the Branch Manager position.

4

26.     In the meantime, while Defendant searched for a new Branch Manager, Defendant brought on a manager from Defendant's corporate office, Mr. Matthew Frederickson, as the Temporary Branch Manager.

27.     Several weeks after Plaintiff applied for the Branch Manager position, he had not heard from anyone about his application or any possible interview.

28.     Mr. Frederickson leaned heavily on Plaintiff to understand the operations and logistics of the company.

29.     In particular, Plaintiff attended numerous one-on-one meetings with Mr. Frederickson to go over operations of the Defendant's "Install Division" because that team was not meeting deadlines and not performing well.

30.     Plaintiff was not in charge of this division and developing new policies and procedures for this division was not part of Plaintiff's job duties or job description. Nevertheless, Plaintiff had a vested interest in the success of the company and therefore Plaintiff offered to help Mr. Frederickson because Plaintiff had a track record of success remedying these issues with ASC.

31.     When Plaintiff offered to help Mr. Frederickson get the Install Division "back-on-track," Mr. Frederickson appeared excited and relieved, providing Plaintiff full permission to temporarily oversee that division to identify the pain points creating issues and implementing new procedures to fix them, which Plaintiff did with great success.

32.     On or about August 6, 2025, the Defendant's office experienced a power outage, and all employees were working remotely.

33.     On the morning of August 6, Plaintiff attended a virtual meeting with several other employees on Microsoft Teams, including Mr. Frederickson.

34.     During this morning call, Plaintiff accidentally spilled his freshly brewed hot coffee and reflexively exclaimed "F***" while another employee was speaking.

35.     At the time, Plaintiff believed that his microphone was mute when this occurred. Unfortunately, unbeknownst to him, his microphone was not muted and all the attendees heard Plaintiff's use of the expletive word.

36.     The next day, on or about August 7, 2025, Plaintiff went into the office as normal and came across Mr. Frederickson once in the building.

37.     Upon seeing Plaintiff, Mr. Frederickson said that Plaintiff needed to pick up a call and that Plaintiff should go to his office so that Mr. Frederickson could call him.

38.     Bewildered, Plaintiff complied by going to his office to take the sudden phone call.

39.     Now on the phone call with Mr. Frederickson and a Human Resources representative, Christopher Freeken, they informed Plaintiff that a complaint had been filed against Plaintiff about an incident that occurred during the Microsoft Teams meeting the day before. Additionally, Plaintiff was informed that an investigation into the incident was being conducted concerning what transpired on the Teams meeting.

40.     At first, Plaintiff was confused about what incident they were referring to because he did not recall anything notable happening during the meeting. Mr. Freeken then explained to Plaintiff what was being investigated.

41.     Specifically, Mr. Freeken stated that the investigation was in response to Plaintiff saying "f*** you" to the Project Manager speaking at the time during the meeting.

42.     Plaintiff explained the situation to Mr. Frederickson and Mr. Freeken—that he did not know his microphone was not muted and that he said "f***" in response to spilling his hot

6

coffee. In response, Mr. Freeken stated that it was a weird thing to say, that it was "convenient timing," and that it was an odd comment to make when spilling hot coffee.

43.     In this same meeting, Plaintiff inquired with Mr. Frederickson as to whether he heard Plaintiff say "f*** you" during the meeting. Mr. Frederickson replied that he did not hear Plaintiff make that statement, nor did he hear anything similar during the meeting. Mr. Frederickson stated further that there had allegedly been other complaints about Plaintiff not being a team player and also that Plaintiff has been noted as "aggressive." However, Mr. Frederickson would not expand upon those complaints any further.

44.     Before ending this meeting, Mr. Frederickson required that Plaintiff send an email to him and Mr. Freeken with a full statement explaining that he would be a team player. If Plaintiff failed or refused to send this email to them, Mr. Frederickson threatened that he would take that as an indication of Plaintiff "making his decision," *i.e.*, that Plaintiff was resigning because he would not agree to be a "team player."

45.     Accordingly, out of fear of losing his job and in response to Mr. Frederickson's threat, Plaintiff wrote an email to him and Mr. Freeken on August 7, 2025, with the subject, "going forward."

46.     In that email, Plaintiff expressed his appreciation to them for the "feedback" given during their meeting, and stated further: "I appreciate the chance to grow, and I'm ready to put in the effort to make a difference. I'm committed to making meaningful changes and will show you this. Moving forward, I will: [1] Actively listen to my teammates and value their input [2] communicate openly and respectfully, even during challenges [3] focus on shared goals rather than individual outcomes [4] ask you for feedback regularly to ensure I'm on the right track. . . ."

7

47.    Once Plaintiff sent this email, complying with Mr. Frederickson's threats, Plaintiff believed that the issue had been resolved.

48.    Then, on August 8, 2025, Plaintiff went into work again like normal.

49.    Once Plaintiff was in the building, Mr. Frederickson immediately summoned Plaintiff to his office.

50.    Mr. Frederickson then informed Plaintiff that they concluded the investigation and that Plaintiff was terminated effective immediately.

51.    Mr. Frederickson did not provide Plaintiff with any reasons beyond this information, then proceeded to immediately confiscate Plaintiff's work issued phone and vehicle, told Plaintiff to collect his things at once and leave, and offered to order Plaintiff an Uber home.

52.    Shortly thereafter, Mr. Freeken sent Plaintiff an email to Plaintiff's personal account stating that Plaintiff's final date of employment was August 8, 2025, and provided Plaintiff documents concerning the transition.

53.    To date, Defendant still has not provided Plaintiff with a specific reason for his termination or an explanation regarding the outcome of Mr. Freeken's investigation into the incident.

54.    Regardless, even if any of the allegations were true, Plaintiff would not have been terminated except that his age was a motivating factor in his termination.

55.    In particular, Defendant fosters a culture among its employees and work environment that encourages the use of profanity in the workplace, and it is commonplace for it to occur.

56.    For example, in the same meeting that Plaintiff allegedly told the speaking Project Manager "f*** you," Mr. Frederickson himself joked in the beginning that another employee did

8

not have their video camera on because "he was giving the middle finger to everyone." All the meeting attendees laughed at this joke.

57. In reality, Defendant embarked on this campaign of retaliation against Plaintiff because he filed his own complaint with HR about the excessively incessant use of profanity in the office, which Plaintiff found inappropriate.

58. Specifically, Plaintiff filed a complaint due to a coworker keeping items with explicit messages out on display for the entire office to see.

59. These explicit items included a candle with the statement "you just have to take it one 'are you fucking kidding me' at a time," a coffee mug that said "mother f*cking homeowner," and pens with explicit slogans for each day of the week, including "throat punch Tuesday," "wish a bitch would Wednesday," "thundercunt Thursday," and "fuck off it's Friday."

 

9



60.     Despite Plaintiff's complaint to HR about these explicit materials, that significantly younger employee was never told to remove them or that they were inappropriate for the office, nor disciplined for showcasing these materials for the entire office.

61.     Prior to the HR investigation and Plaintiff's ultimate termination, Plaintiff had never been disciplined for inappropriate behavior, poor job performance, or any other reason. To the contrary, Plaintiff had garnered an impeccable reputation among the security industry and clients, building a prosperous career where he made a significant impact within the Pennsylvania, New Jersey, and Delaware markets.

62.     Therefore, Defendant engaged in an exerted effort to fabricate a terminable offense as pretext to terminate Plaintiff when the Defendant's true reason for Plaintiff's termination was his age and complaint to HR about his objections to the inappropriate behavior in the office.

63.     Even if any of the allegations were true, Plaintiff would not have been terminated except that his age and protected activity were motivating factors in his termination.

64. As a result of Defendant's actions, Plaintiff was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

65. As a result of Defendant's acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, especially only a few years away from Plaintiff's planned retirement.

## FIRST COUNT

### Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*
### (Failure to Hire/Promote)

66. Plaintiff repeats and realleges each and every allegation in all the previous paragraphs as if fully set forth at length herein.

67. The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623(a) provides that: It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

68. Plaintiff, James ("Jim") Brady, was sixty-one (61) years of age at the time Defendant wrongfully terminated his employment. Thus, Plaintiff is a member of a protected class as defined under the ADEA.

69. Defendant "hired" Plaintiff on or about July 1, 2024, when Defendant retained Plaintiff in his position as "Service Manager" upon Defendant's acquisition of ASC (Access Security Corporation).

70. In or around July 2025, Defendant had an opening for a "Branch Manager" position at Defendant's Pennsylvania branch located at 1025 Thomas Drive, Warminster, Pennsylvania 18974—the same location that Plaintiff had worked for over twenty (20) years.

11

71.     Defendant posted this position on internet job boards, such as LinkedIn, about the same time, in or around July 2025.

72.     The job post for this position states that "[t]he Branch Manager is the overall leader of a security branch, overseeing all operational aspects, including staff management, client relations, budgeting, and performance monitoring. This role requires both strategic thinking and day-to-day management skills to ensure that the branch runs smoothly and meets both company and client expectations. A Branch Manager is responsible for supervising security operations, implementing policies and procedures, ensuring compliance with regulations, and fostering a high level of customer satisfaction. The individual must also drive the branch's growth, whether by expanding services, improving efficiency, or managing resources effectively. This role requires a combination of leadership, customer service expertise, and an in-depth understanding of security protocols." *See*, **Exhibit C, Defendant's Branch Manager Job Post**.

73.     In or around July 2025, Plaintiff applied for this position and met all the requisite qualifications for the role based on his over 20 years of experience overseeing all of these aspects at that specific location under the previous company ownership and as the right-hand man to the founder.

74.     Moreover, Plaintiff had never been disciplined or placed on a Performance Improvement Plan ("PIP") for any reason throughout the entirety of his career beyond the single instance leading up to Plaintiff's wrongful termination.

75.     Plaintiff was rejected from the position and never even received an interview.

76.     At the time of and after Plaintiff's wrongful termination, Defendant continued to seek applications from people outside of Plaintiff's protected class and/or with similar qualifications.

77.    The Defendant engaged in an illegal and unlawful employment practice of replacing older, more senior, more experienced, and high paid employees, such as Plaintiff, who was wrongfully terminated, and replacing them with younger, less senior, less experienced, and lower paid employees, who were hired in place of the older, more experienced, more senior, and more highly paid employees.

78.    The willful actions of the Defendant in terminating Plaintiff's employment and refusing to consider him for the Branch Manager position are part of a pattern and practice of illegal and unlawful age discrimination, age harassment, age hostility, and age retaliation committed by the Defendant against Plaintiff, in violation of the applicable Federal and State laws.

79.    As a direct and proximate result of the willful, illegal, and unlawful actions of the Defendant, Plaintiff has been caused to suffer, and he continues to suffer, severe economic losses by way of lost pay, wages, salary, earnings, benefits, and other employee renumerations, and the undeserved and painful diminution of his abilities to provide for himself and his family with the earned rewards of excellence in his career, as well as emotional distress and humiliation, pain and suffering, medical expenses; mental, emotional, and physical injuries; significant losses of wages and losses of earning capacity and powers; and the inability to attend to his usual, customary and normal daily duties, occupations, and activities of daily living and employment and occupational activities, and he has sustained the permanent diminution in his abilities to enjoy the activities of daily living, to enjoy life's pleasures, to earn wages, to work, and to be employed.

80.    Defendant's upper-level managers knew or should have known about the discrimination, retaliation, and termination of Plaintiff, and rather than stop it, allowed it to happen and actively participated in it.

81.     Plaintiff suffered emotional distress, upset, and humiliation due to his wrongful termination,

82.     Plaintiff suffered and continues to suffer financial loss due to his wrongful termination.

83.     In addition, the financial loss contributes to Plaintiff's distress, upset, and humiliation.

## SECOND COUNT

**Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.***
**(Age Discrimination and Wrongful Termination)**

84.     Plaintiff repeats and realleges each and every allegation of all the previous paragraphs as if fully set forth at length herein.

85.     Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623(a) provides that: It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

86.     At the time Defendant terminated Plaintiff's employment, Plaintiff was sixty-one (61) years of age. Thus, Plaintiff is a member of a protected class as defined under the ADEA.

87.     At all times material hereto, Plaintiff was qualified for his position and performed his job well.

88.     As described at length above, Defendant subjected Plaintiff to an unwarranted and unfounded investigation into an incident in which Plaintiff allegedly told another manager to "f*** off" during a virtual meeting.

89.     At the conclusion of Defendant's investigation into Plaintiff's alleged explicit comment, Defendant's manager, Matthew Frederickson, gave Plaintiff an ultimatum: Plaintiff

14

could either (1) draft a letter addressed to Mr. Frederickson and Mr. Freeken (HR Business Partner) stating Plaintiff's intent to be a "team player" and his commitment to the company, or (2) refuse to draft said letter, which would be effectively received as Plaintiff's immediate resignation.

90.    Accordingly, Plaintiff drafted and sent the requested letter to Mr. Frederickson and Mr. Freeken out of fear of losing his job.

91.    During the meeting in which Mr. Frederickson demanded that Plaintiff draft this letter, Plaintiff addressed the double standard that he was being disciplined for accidentally using an expletive when other employees were permitted to use this language without any and without fear of repercussions.

92.    Prior to this disciplinary action, Plaintiff had never been disciplined for poor performance, let alone for inappropriate or unprofessional behavior.

93.    Other employees outside of Plaintiff's protected class were not disciplined or discharged for the same or similar conduct, and Plaintiff was treated differently and discriminated against because of his age.

94.    Defendant cannot articulate a legitimate, nondiscriminatory reason for disciplining and discharging Plaintiff, and any stated reason which Defendant may or does provide is no more than mere pretext to create a façade for its discrimination against Plaintiff because of his age.

95.    Defendant and Defendant's upper-level managers knew or should have known about the discrimination against Plaintiff, and rather than stop it, allowed it to happened and actively participated in it.

96.    In fact, as discussed above, Defendant's upper-level managers aided and abetted Defendant in discriminating against Plaintiff based on his age.

97.    Defendant failed to prevent its upper-level managers' discriminatory conduct.

15

98.     Defendant did not have a policy in place to prevent, monitor, detect, investigate, and/or address discrimination, and if it did, it existed only on paper.

99.     Defendant failed to have effective mechanisms in place to train its employees, including its human resources and management-level employees, on anti-discrimination, anti-harassment, and anti-retaliation policies and procedures.

100.    Defendant is liable for its own conduct and for the conduct of its employees and agents.

101.    Plaintiff suffered and continues to suffer financial loss due to the discrimination.

102.    In addition, the financial loss contributes to Plaintiff's distress, upset, and humiliation.

**THIRD COUNT**

**Violations of the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.***

**(Age Discrimination)**

103.    Plaintiff repeats and realleges each and every allegation of all the previous paragraphs as if fully set forth at length herein.

104.    Defendant violated the Pennsylvania Human Relations Act ("PHRA") because Defendant illegally and unlawfully discriminated against Plaintiff based on his age.

105.    Defendant is an "employer" as defined under the PHRA because Defendant employs more than four persons within the Commonwealth of Pennsylvania.

106.    The actions of Defendant as previously described above at length constitute unlawful and illegal age discrimination, age harassment, and age hostility under the PHRA.

107.    Defendant took these adverse employment actions against Plaintiff in violation of the PHRA, which were performed against Plaintiff by Defendant with wanton, malicious, willful,

and reckless disregard of Plaintiff's legal rights, thereby entitling Plaintiff to both compensatory and punitive damages.

108. In particular, Defendant continued to engage in certain acts of age discrimination, age harassment, and age hostility against Plaintiff with the knowledge that such discrimination, harassment, and hostility were egregious and offensive to Plaintiff, and then retaliating against him by terminating his employment for objecting to and opposing this conduct, thus creating liability for punitive damages for such acts performed with "indifference to plaintiff's federally protected rights."

109. Defendant and Defendant's upper-level managers knew or should have known about the discrimination against Plaintiff, and rather than stop it, allowed it to happened and actively participated in it.

110. In fact, as discussed above, Defendant's upper-level managers aided and abetted Defendant in discriminating against Plaintiff based on his age.

111. Defendant failed to prevent its upper-level managers' discriminatory conduct.

112. Defendant did not have a policy in place to prevent, monitor, detect, investigate, and/or address discrimination, and if it did, it existed only on paper.

113. Defendant failed to have effective mechanisms in place to train its employees, including its human resources and management-level employees, on anti-discrimination, anti-harassment, and anti-retaliation policies and procedures.

114. Defendant is liable for its own conduct and for the conduct of its employees and agents.

115. Plaintiff suffered and continues to suffer financial loss due to the discrimination.

116.    In addition, the financial loss contributes to Plaintiff's distress, upset, and humiliation.

117.    Lastly, the intentional and malicious actions and/or willful indifference of Defendant and its upper-level managers justify the imposition of punitive damages.

### FOURTH COUNT

### Common Law Fraud Under Pennsylvania State Law

### (Negligent Misrepresentation)

118.    Plaintiff repeats and realleges each and every allegation of all the previous paragraphs as if fully set forth at length herein.

119.    Under Pennsylvania law, a negligent misrepresentation is (1) a misrepresentation of material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and, (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999).

120.    Plaintiff alleges that Defendant fraudulently induced Plaintiff into executing an agreement containing restrictive covenants, including an agreement not to compete.

121.    Specifically, after Defendant's successful merger with Plaintiff's former company, Defendant offered certain classes of employees an opportunity to purchase stock Defendant's company pursuant to an Amended and Restated Limited Partnership Agreement (the "Investment Agreement").

122.    Under the Investment Agreement, Plaintiff could purchase 500 Class A Units of the Partnership in exchange for $50,000.00 and by agreeing to the terms of the entire agreement.

123.    At the time that Defendant offered this to its employees, it championed the offer as an opportunity to have a vested interest in the growth and success of the company and an incentive to perform at a high level.

124.    The Investment Agreement also contains several restrictive covenants, including an "Agreement Not to Compete," which provides that no owner of Class A shares is permitted to work within the security for a period of two (2) years within the "Covered Area" after selling those shares. The "Covered Area" includes any and all geographic areas where Defendant operates or provides services to customers.

125.    Defendant currently operates up and down the entire East Coast of the United States, with approximately twenty-nine (29) locations, three (3) of which are located in Pennsylvania and New Jersey, in addition to offices in Delaware, New York, Virginia, and other states.

126.    In essence, under the Investment Agreement, Plaintiff must either (1) transition to an entirely different industry for two (2) years until the non-compete period runs, or (2) uproot his entire life and family to another state on the West Coast of the United States to continue working in the same industry.

127.    Yet even these two options would not suffice because the non-compete clause restricts Plaintiff's options even further by disallowing him opportunities for employment anywhere that one of its clients has a facility, which Defendant boasts that "[m]any of our clients have facilities around the world."

128.    Therefore, Plaintiff is essentially out of a job within the industry that he has spent his entire career in and in which his expertise is so niche and specific that his knowledge is not transferrable.

19

129.    Upon information and belief, at the time that Defendant offered Plaintiff the opportunity to invest pursuant to this Investment agreement, Defendant misrepresented its intention to keep Plaintiff employed at the company.

130.    Instead, upon information and belief, Plaintiff alleges that Defendant already made the decision to replace older, more senior, more experienced, and higher paid employees, such as Plaintiff, and replace them with younger, less senior, less experienced, and lower paid employees.

131.    Defendant knew or should have known that it was going to terminate these older, more senior, more experienced, and higher paid employees, and sought to induce Plaintiff into purchasing stock in its company in order to thwart Plaintiff's ability to obtain new employment after it wrongfully terminated him.

132.    Now, Plaintiff is injured by way of an inability to obtain new employment in the industry that he has spent his entire career working in, only a few short years before Plaintiff was set to retire.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter judgment in his favor against the Defendants, and order that:

A.    Defendants compensate Plaintiff with back pay, at a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination based on his age and for his unlawful retaliation.

B.    Defendants compensate Plaintiff with an award of front pay, if appropriate.

C.    Defendants pay to Plaintiff punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses as allowable.

20

D.      Defendants pay to Plaintiff pre- and post-judgment interest, costs of suit, attorneys' fees, and experts' fees as allowed by law.

E.      Defendants shall void any and all restrictive covenants against Plaintiff's ability to obtain future employment.

F.      Defendants shall eliminate all unlawful discriminatory practices as well as remedy the discriminatory effect of past practices and procedures.

G.      The Court shall award such other relief as if deemed just and proper, in law and/or equity, including injunctive relief if the Honorable Court deems said relief appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

**MALAMUT & ASSOCIATES, LLC**

By: /s/ *Mark R. Natale*

Mark R. Natale, Esquire
PA Bar ID: 316939
457 Haddonfield Road, Suite 500
Cherry Hill, New Jersey 08002
P: (856) 424-1808
F: (856) 424-2032
E: mnatale@malamutlaw.com
*Attorneys for Plaintiff*, James Brady